UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH NORMAN,<br><br>                   Plaintiff,<br><br>         v.<br><br>MOUNT VERNON HOSPITAL; FELIX<br>EZEKWE, M.D.; DR. MAGILL; DR.<br>OSCAR MARCILLA,<br><br>                   Defendants. | No. 17-CV-9174 (KMK)<br><br><u>OPINION & ORDER</u> |

<u>Appearances:</u>

Joseph Norman
Ossining, NY
*Pro se Plaintiff*

Roy W. Breitenbach, Esq.
Nicholas M. Summo, Esq.
Garfunkel Wild, P.C.
Great Neck, NY
*Counsel for Defendant Mount Vernon Hospital*

Brendan M. Horan, Esq.
Nicholas P. Stabile, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants Felix Ezekwe, M.D., and Dr. Magill*

Monica G. Snitily, Esq.
O'Connor, McGuinness, Conte, Doyle & Oleson
White Plains, NY
*Counsel for Defendant Dr. Oscar Marcilla*

KENNETH M. KARAS, United States District Judge:

      Pro se Plaintiff Joseph Norman ("Plaintiff") brings this Action, pursuant to 42 U.S.C.

§ 1983, against Felix Ezekwe, M.D. ("Dr. Ezekwe"), Dr. Magill ("Dr. Magill"; with Dr. Ezekwe,

"State Defendants"), Dr. Oscar Marcilla ("Dr. Marcilla"), and Mount Vernon Hospital ("Mount

Vernon"; collectively, "Defendants"), alleging that Defendants were deliberately indifferent to

his medical needs in violation of the Eighth Amendment.  (*See* Third Amended Complaint

("TAC") (Dkt. No. 62).)

Before the Court are the Motions to Dismiss the Third Amended Complaint ("TAC") of

the State Defendants (the "State Defendants' Motion"), Dr. Marcilla (the "Marcilla Motion"),

and Mount Vernon (the "Mount Vernon Motion"; with the State Defendants' Motion and the

Marcilla Motion, the "Motions"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  (*See* Not. of Mount Vernon Mot.; Not. of Marcilla Mot.; Not. of State Defs.' Mot.

(Dkt. Nos. 79, 85, 90).)  For the following reasons, the Mount Vernon Motion and the Marcilla

Motion are granted.  The State Defendants' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's TAC and Plaintiff's Opposition to the

Motions, (Pl.'s Mem. of Law in Opp'n to Mots. ("Pl.'s Mem.") (Dkt. No. 92)), and are taken as

true for the purpose of resolving the instant Motions.[1]

Plaintiff has been an inmate in the custody of the New York State Department of

Corrections and Community Supervision ("DOCCS") since April 18, 1990.  (TAC ¶ 8.)  On

January 7, 2016, while playing basketball at Sing Sing Correctional Facility ("Sing Sing"),

Plaintiff injured a finger on his right hand, which caused "swelling and excruciating pain."  (*Id.*

---

[1] The Court properly considers factual allegations contained in Plaintiff's opposition papers to the extent that those allegations are consistent with the TAC.  *See Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) ("[W]here a pro se plaintiff is faced with a motion to dismiss, a court may consider materials outside the complaint to the extent that they are consistent with the allegations in the complaint." (citation, italics, and quotation marks omitted)); *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997) ("[T]he mandate to read the papers of pro se litigants generously makes it appropriate to consider [a] plaintiff's additional materials, such as his opposition memorandum." (citations omitted)).

¶ 9-A.)[2]  Plaintiff was sent to the hospital at Sing Sing, where he was seen by Dr. Ezekwe.  (*Id.*)

Dr. Ezekwe ordered x-rays of Plaintiff's hand, which showed that Plaintiff's finger was

dislocated.  (*Id.*)  According to Plaintiff, this injury "required resetting to alleviate unnecessary

pain and avoid further damage to Plaintiff's hand."  (*Id.*)  Dr. Ezekwe did not attempt to

reset Plaintiff's finger and did not put it in a brace, instead sending Plaintiff to Mount Vernon.

(*Id.*)

Once Plaintiff arrived at Mount Vernon, Dr. Marcilla examined his injury.  (*Id.* ¶ 9-B.)

Dr. Marcilla determined that the injury was "not life-threatening," and told Plaintiff that he

would be scheduled to see a bone specialist.  (*Id.* (quotation marks omitted).)  At the time, Dr.

Marcilla did not reset Plaintiff's finger and did not provide him with pain medication.  (*Id.*)

According to Plaintiff, he remained in "extreme pain."  (*Id.*)  Plaintiff further alleges that Mount

Vernon was "allowed to make and implement illegal policies concerning the course of treatment

given to inmates," "provided [P]laintiff with inadequate medical care," and "failed to train[]

[and] supervise its employees to provide[] adequate training and care."  (*Id.* ¶¶ 6, 17.)[3]

---

[2] Plaintiff's TAC includes two paragraphs numbered as paragraph nine.  Thus, the Court labels these paragraphs as ¶¶ 9-A and 9-B.

[3] Plaintiff appears to also allege in his Opposition that Dr. Marcilla did not put his finger in a brace or splint when he left Mount Vernon.  (*See* Pl.'s Mem. 7 ("[D]efendant[] . . . Marcilla cannot escape responsibility when a reasonable physician would have conducted the simple process of re[-]setting . . . [P]laintiff's [finger], [or] plac[ing] [P]laintiff's hand in a brace or splint to [e]nsure that it would not result in future damage when presented with [x]-[r]ays showing [P]laintiff['s] dislocated finger.").)  However, Plaintiff alleged in his Complaint, Amended Complaint, and Second Amended Complaint ("SAC") that before his discharge from Mount Vernon, "his right hand was medically placed into a splint," and his right shoulder was put in a sling.  (Compl. ¶ 15 (Dkt. No. 2); Am. Compl. 8 (Dkt. No. 8); Second Am. Compl. ("SAC") 5 ("In the mean[time], Plaintiff's right finger was placed into a splint[,] and his right shoulder was stabilized in a sling . . . .") (Dkt. No. 27).)  Therefore, to the extent Plaintiff now alleges that Dr. Marcilla did not put his finger in a brace or a splint, the Court will not consider this allegation herein.  *See Wheeler v. Slanovec*, No. 16-CV-9065, 2019 WL 2994193, at *6 (S.D.N.Y. July 9, 2019) ("In cases where allegations in an amended pleading directly contradict

On February 27, 2016, Plaintiff saw Dr. Magill at the Fishkill Correctional Facility Hospital ("Fishkill"). (*Id.* ¶ 10.) Dr. Magill observed that Plaintiff's injury had occurred "approximately a month and a half prior to the examination," and he asked Plaintiff "why his finger had not been realigned earlier by the two doctors who treated [P]laintiff at . . . Sing Sing and Mount Vernon." (*Id.* (quotation mark omitted).) Dr. Magill explained that broken bones begin to heal themselves 14 days after an injury and, as such, realigning Plaintiff's finger was a "basic medical procedure that should have been performed the same day . . . the injury occurred." (*Id.* ¶¶ 11–12.) Dr. Magill observed that "failure to correct the injury immediately caused irreparable damage[] to [P]laintiff's hand." (*Id.* ¶ 11.) Dr. Magill determined that Plaintiff would need surgery on his finger "[a]s a result of . . . [Dr.] Marcilla['s] and [Dr.] Ezekwe['s] failure to reset [P]laintiff['s] hand in a timely fashion." (*Id.* ¶ 12.) Dr. Magill explained that the surgery would involve "opening up [Plaintiff's] finger, rebreaking the bone, resetting the bone correctly in place, and inserting surgical pins into the bone to keep the bone in place while it began the process of healing." (*Id.* ¶ 14.) Dr. Magill scheduled Plaintiff's surgery for October 2016, nine months after Plaintiff's original injury, which "increase[ed] [the] risk[] of permanent deformation of [Plaintiff's] hand." (*Id.* ¶ 13.) Plaintiff alleges that Dr. Magill "was aware that such a long delay [before] surgery would make a successful[] repair of [P]laintiff's finger and the chance of normal use of [P]laintiff's hand unlikely," (*id.*), and scheduled the surgery for October "knowing" of this risk, (Pl.'s Mem. 2).

---

pleadings in the original complaint, courts have disregarded the amended pleading." (citation and quotation marks omitted)); *cf. Paul v. Bailey*, No. 09-CV-5784, 2013 WL 2896990, at *5 (S.D.N.Y. June 13, 2013) (finding it proper to consider factual allegations made by a pro se plaintiff in his opposition papers because those facts were "*consistent* with those in the initial complaint and amended complaints" (emphasis added)).

On October 22, 2016, Plaintiff was taken to Mount Vernon for the surgery by Dr. Magill. (TAC ¶ 15.)  Before Plaintiff's discharge, he was told that the sutures in his wound would be removed in two weeks, but that the surgical pins would remain in his finger for six to eight weeks.  (*Id.*)  However, Dr. Magill did not remove the pins in Plaintiff's finger until February 22, 2017, "approximately four month[s] after the surgery."  (*Id.* ¶ 16.)  Prior to removal of the pins, Plaintiff complained to Sing Sing medical staff and the Inmate Grievance Resolution Committee about his "urgent need to have the pins removed from his fingers" and the "extreme pain" that he was suffering.  (*Id.*)

Plaintiff alleges that Defendants' conduct "caused permanent damages, a visible deformation of his right hand, . . . the inability to use his right hand effectively, to perform his daily basic activities, and pain and suffering experienced from the date of the injury that will last for the rest of Plaintiff's life."  (*Id.* ¶ 23.)  Plaintiff seeks $150,000 in compensatory damages and $25,000 in punitive damages.  (*Id.* ¶¶ 23–24.)

B.  Procedural Background

Because the procedural background of this Action has been summarized in the Court's previous Opinion & Order on State Defendants' Motion To Dismiss the Second Amended Complaint (the "2019 Opinion"), the Court supplements the procedural history of the case since the issuance of the 2019 Opinion below.

On July 11, 2019, the Court issued the 2019 Opinion, which granted State Defendants' Motion To Dismiss the Second Amended Complaint ("SAC").  (*See generally* 2019 Op. (Dkt. No. 61).)  The Court gave Plaintiff 30 days to file a third amended complaint.  (*Id.* at 14–15.)  Plaintiff filed his TAC on August 8, 2019.  (*See generally* TAC.)  On August 22, 2019, State Defendants and Mount Vernon sought leave to file motions to dismiss and requested that the

Court stay discovery until a decision on the motions.  (Dkt. Nos. 64, 66.)  On August 26, 2019,

Dr. Marcilla requested the same.  (Dkt. No. 67.)  The Court instructed Plaintiff to respond, (Dkt.

No. 68), which he did on September 5 and September 9, 2019, (Dkt. Nos. 71–72).  Thereafter,

the Court set a briefing schedule for the instant Motions.  (Dkt. No. 73.)  Pursuant to the

schedule, Defendants filed their respective Motions on October 11, 2019.  (Not. of Mount

Vernon Mot.; Decl. of Roy W. Breitenbach, Esq. in Supp. of Mount Vernon Mot. ("Breitenbach

Decl.") (Dkt. No. 80); Mem. of Law in Supp. of Mount Vernon Mot. ("Mount Vernon Mem.")

(Dkt. No. 81); Not. of Marcilla Mot.; Decl. of Monica G. Snitily, Esq. in Supp. of Marcilla Mot.

("Snitily Decl.") (Dkt. No. 86); Mem. of Law in Supp. of Marcilla Mot. ("Marcilla Mem.") (Dkt.

No. 89); Not. of State Defs.' Mot.; Mem. of Law in Supp. of State Defs.' Mot. ("State Defs.'

Mem.") (Dkt. No. 91).)  The Court granted Mount Vernon's request to file certain documents

related to Plaintiff's medical treatment under seal.  (Dkt. Nos. 77, 83.)  Plaintiff filed his

Opposition on November 18, 2019.  (Pl.'s Mem.)  After receiving an extension from the Court,

(Dkt. No. 94), Defendants filed their respective Replies on December 9, 2019.  (Reply Mem. of

Law in Supp. of Marcilla Mot. ("Marcilla Reply Mem.") (Dkt. No. 95); Reply Mem. of Law in

Supp. of Mount Vernon Mot. ("Mount Vernon Reply Mem.") (Dkt. No. 96); Reply Mem. of Law

in Supp. of State Defs.' Mot. ("State Defs.' Reply Mem.") (Dkt. No. 98).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motions, the Court is required to "accept as true all of the factual allegations contained in the [TAC]."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same).  And, the Court must "draw[] all reasonable inferences in favor of the plaintiff."  *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 145 (2d Cir.

2012)).  Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."  *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted).  However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted).  However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents either in [the] plaintiff[']s possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted).

8

B.  Analysis

    1.  Mount Vernon

Mount Vernon argues that Plaintiff has not asserted any specific allegations against it and has failed to allege that Mount Vernon acted under color of state law.  (Mount Vernon Mem. 5–8.)  Mount Vernon also argues that Plaintiff has failed to state a claim against it under the Eighth Amendment.  (*Id.* at 8–11.)  The Court addresses each argument to the extent necessary.[4, 5]

By alleging that Mount Vernon implemented "illegal policies concerning the course of treatment given to inmates," "failed in [its] constitutional obligation and provided [P]laintiff with inadequate medical care while under [its] supervision," and "failed to train[] [and] supervise its employees to provide[] adequate training and care," (TAC ¶¶ 6, 17), Plaintiff appears to state municipality-related claims against Mount Vernon.  "Congress did not intend municipalities to

---

[4] Mount Vernon submitted certain medical records under seal with its Motion, arguing that because Plaintiff "refers to his medical treatment throughout his [TAC], the Court may consider these records when deciding this [M]otion."  (Mount Vernon Mem. 1 n.2; *see* Breitenbach Decl. Ex. B, C ("Medical Records") (Dkt. Nos. 80-2, 80-3).)  However, "[a]t this [early] stage, the Court [will not] consider[] . . . any . . . records contained only in Defendants' exhibits."  *James v. Gage*, No. 15-CV-106, 2018 WL 2694436, at *1 n.2 (S.D.N.Y. June 5, 2018).

[5] Mount Vernon asserts that "[a]s a general rule, private hospitals do not act under the color of state law for § 1983 purposes."  (Mount Vernon Mem. 8 (alteration and quotation marks omitted) (quoting *Sykes v. McPhillips*, 412 F. Supp. 2d 197, 200 (N.D.N.Y. 2006).)  However, Plaintiff alleges that Mount Vernon "entered into a contract with [DOCCS] that granted Mount Vernon . . . the exclusive right to provide adequate medical services to inmate[s] confined [by DOCCS]."  (TAC ¶ 6.)  Mount Vernon fails to address this allegation and the fact that "courts have sometimes found non-public medical providers to be state actors when they provide medical care to inmates . . . outside of a prison pursuant to a contract."  *Hollman v. County of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *5 (E.D.N.Y. Jan. 27, 2011) (citation omitted); *see also Sykes*, 412 F. Supp. 2d at 202 ("It is also clear that hospitals and physicians that provide care outside of the prison facility may be held to be state actors when they work pursuant to a contract." (citation omitted)).  However, the Court finds that it is unnecessary to decide this issue herein, as Plaintiff has failed to state a claim against Mount Vernon under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior" (citation and italics omitted)). Rather, "municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right." *Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008).

A plaintiff may satisfy the "policy, custom[,] or practice" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations and quotation marks omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 227–28 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged

constitutional injury. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985) ("The

fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy

*Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional*

violation.  There must at least be an affirmative link between[, for example,] the training

inadequacies alleged, and the particular constitutional violation at issue." (emphasis in original));

*see also Simms v. City of New York*, 480 F. App'x 627, 629 (2d Cir. 2012) (finding that the

plaintiff "must 'demonstrate that, through its deliberate conduct, the [entity] itself was the

moving force behind the alleged injury'" (citation and alteration omitted)).  Thus, Plaintiff

cannot merely allege the existence of a policy or custom but "must allege facts tending to

support, at least circumstantially, an inference that such a municipal policy or custom exists."

*Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citation omitted).

Here, Plaintiff has not adequately alleged "a formal policy officially endorsed by the

municipality," *Brandon*, 705 F. Supp. 2d at 276 (citation omitted), and a link between that policy

and the alleged constitutional violations.  Plaintiff states only that "Mount Vernon . . . was

allowed to make and implement illegal policies concerning the course of treatment given to

inmates."  (TAC ¶ 6.)  "Under *Monell*, however, mere allegations that a policy exists are not

enough," and "the [TAC] must allege some factual description of how the policy worked in

practice, not merely that it existed."  *Hotter v. Schriro*, No. 16-CV-6586, 2018 WL 2081863, at

*7 (S.D.N.Y. Mar. 29, 2018) (citation omitted).  Plaintiff does not provide *any* details on what

these policies were or how they worked in practice, and does not allege that Dr. Marcilla

"possessed policymaking authority such that his conduct alone could establish *Monell* liability."

*Torres v. Vasta*, No. 18-CV-8706, 2019 WL 4640247, at *4 (S.D.N.Y. Sept. 24, 2019) (footnote

omitted) (collecting cases).  Plaintiff also "does not allege that [Dr. Marcilla] or any other

official acted pursuant to a practice so consistent and widespread that it essentially constitute[d] a custom or usage of which a supervising policymaker must have been aware; rather, Plaintiff's allegations are confined to his own treatment, thus dooming this claim." *Id.* (citations omitted); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing . . . . Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." (some citations omitted) (citing *Monell*, 436 U.S. at 690–91)); *Mejía v. N.Y.C. Health and Hosps. Corp.*, No. 16-CV-9706, 2018 WL 3442977, at *12 (S.D.N.Y. July 17, 2018) (dismissing *Monell* claim against a hospital where the plaintiff "allege[d] no facts regarding any conduct by the hospital in connection with any other patient," and addressed only "his own brief stay at the hospital").

To the extent that Plaintiff seeks to allege a failure to train or supervise by Mount Vernon, this claim fails as well. Plaintiff states only that Mount Vernon "failed in [its] constitutional obligation and provided [P]laintiff with inadequate medical care while under [its] supervision" and "failed to train[ and] supervise its employees to provide[] adequate training and care." (TAC ¶¶ 6, 17.) However, Plaintiff has not "point[ed] to the existence of any formal or informal training program," and provides no factual detail about the alleged deficiencies in training. *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *12 (S.D.N.Y. Dec. 21, 2018) (footnote omitted); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 539–40 (S.D.N.Y. 2012) (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Bradley v. City of New York*, No. 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The [c]omplaint's conclusory, boilerplate language—

12

that the [c]ity failed to adequately train, discipline, and supervise employees . . . is insufficient to raise an inference of the existence of a custom or policy." (record citation, alterations, and quotation marks omitted)).

Similarly, although "[a] municipality's failure to properly train [and/or supervise] its employees can under certain circumstances give rise to *Monell* liability, . . . a claim based on this theory must still be properly pled under *Iqbal*." *Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *2 (E.D.N.Y. Sept. 28, 2011) (citation and footnote omitted), *aff'd*, 480 F. App'x 627 (2d Cir. 2012). "To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Treadwell v. County of Putnam*, No. 14-CV-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (citation omitted); *see also Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (explaining that a plaintiff may demonstrate the existence of a custom or policy by alleging "a failure by policymakers to provide adequate . . . supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees" (citation and footnote omitted)). Plaintiff's claim that "Mount Vernon . . . failed to . . . supervise its employees to provide[] adequate training and care," (TAC ¶ 17), is a "boilerplate assertion," *Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y Mar. 25, 2020) (citation and quotation marks omitted), that does not meet this high bar. *See Rivera v. Westchester County*, No. 18-CV-8354, 2019 WL 3958425, at *5 (S.D.N.Y. Aug. 22, 2019) (finding that the plaintiff made only conclusory allegations related to a state actor's failure to train and supervise and that the plaintiff had "cited no specific deficiency in . . .

training or supervision protocols"); *Hotter*, 2018 WL 2081863, at *7 ("Conclusory allegations

that a municipality failed to train and supervise its employees are insufficient to state a *Monell*

claim." (citation, alteration, and quotation marks omitted)).

Accordingly, Plaintiff's claims against Mount Vernon must be dismissed.  *See McKenzie*

*v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *7 (S.D.N.Y. Dec. 28, 2018)

(dismissing *Monell* claim where the plaintiff did "not allege any facts suggesting a policy or

custom that led to [the] alleged" constitutional deprivation").[6]

### 2.  Individual Defendants

Dr. Marcilla and State Defendants argue that Plaintiff has failed to state a claim against

them under the Eighth Amendment.  (Marcilla Mem. 4–7; State Defs.' Mem. 7–18.)  Dr.

Marcilla also contends that Plaintiff has not provided a basis for bringing a § 1983 claim against

a private citizen.  (Marcilla Mem. 3–4.)  State Defendants argue that Plaintiff's claims are barred

by qualified immunity, that claims against them in their official capacities are barred by the

Eleventh Amendment, and that any state law claims are barred as well.  (State Defs.' Mem. 18–

21.)  The Court addresses each argument to the extent necessary.

### a.  Eighth Amendment

"The Eighth Amendment forbids 'deliberate indifference to serious medical needs of

prisoners.'"  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)

(quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  To state a claim of deliberate indifference,

Plaintiff must plausibly allege (1) "that he suffered a sufficiently serious constitutional

---

[6] Given that this is the first adjudication on the merits of Plaintiff's claims against Mount
Vernon, this dismissal is without prejudice.  Because Plaintiff has failed to state a claim under
*Monell*, the Court need not address Mount Vernon's other arguments as to its involvement and
the sufficiency of Plaintiff's claim under the Eighth Amendment.

deprivation," and (2) that Defendants "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *8 (S.D.N.Y. Mar. 30, 2017) (citations omitted).

"The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (citation and quotation marks omitted).  In other words, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations omitted).  Analyzing this objective requirement involves two inquiries: "whether the prisoner was actually deprived of adequate medical care," *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and "whether the inadequacy in medical care is sufficiently serious," which in turn "requires the [C]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280 (citation omitted).  "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003).  Nevertheless, the Second Circuit has suggested the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'"  *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms,

sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178,

185 (2d Cir. 2003) (emphasis in original) (citation and quotation marks omitted).

     "The second requirement is subjective: the charged officials must be subjectively reckless

in their denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted).  This means that

the defendant must "appreciate the risk to which a prisoner was subjected," and have a

"subjective awareness of the harmfulness associated with those conditions." *Darnell v. Pineiro*,

849 F.3d 17, 35 (2d Cir. 2017); *see also Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014)

("Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires

that the charged official act or fail to act while actually aware of a substantial risk that serious

inmate harm will result." (citation, footnote, and quotation marks omitted)).  In other words,

"[i]n medical-treatment cases not arising from emergency situations, the official's state of mind

need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff

proves that the official acted with deliberate indifference to inmate health." *Id.* (citation and

quotation marks omitted).  However, "mere negligence" is insufficient to state a claim for

deliberate indifference. *Walker*, 717 F.3d at 125 (citation and quotation marks omitted).

Moreover, "mere disagreement over the proper treatment does not . . . create a constitutional

claim," and accordingly, "[s]o long as the treatment given is adequate, the fact that a prisoner

might prefer a different treatment does not give rise to an Eighth Amendment violation."

*Chance*, 143 F.3d at 703 (citation omitted).

### i.  Objective Prong

     State Defendants and Dr. Marcilla contend that Plaintiff has not alleged a sufficiently

serious injury under the objective prong.  (State Defs.' Mem. 7–15; Marcilla Mem. 4–6.)  While

the Court agrees that a "broken finger [alone] does not constitute a serious enough injury to

16

satisfy the objective prong of the deliberate indifference test," *Laguna v. Kwan*, No. 13-CV-7079, 2015 WL 872366, at *4 (S.D.N.Y. Jan. 28, 2015) (collecting cases), the Second Circuit has instructed that "it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is . . . sufficiently serious," *Smith*, 316 F.3d at 185 (emphasis in original) (citation and quotation marks omitted). Here, Plaintiff alleges a delay of approximately five weeks before he was seen by Dr. Magill, eight months between his appointment with Dr. Magill and his surgery, and eight weeks beyond the period suggested by Dr. Magill for removal of surgical pins from Plaintiff's finger after his surgery. (TAC ¶¶ 8–10, 13, 15–16.) For a delay in treatment to satisfy the objective element, the delay must generally "involve[] either a needlessly prolonged period . . . , or [have] . . . caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (citations omitted). According to Plaintiff, the delays in his treatment "caused permanent damages, a visible deformation of his right hand, . . . the inability to use his right hand effectively, to perform his daily basic activities, and pain and suffering experienced from the date of the injury that will last for the rest of Plaintiff's life." (TAC ¶ 23.)

Thus, "drawing every reasonable inference in favor of Plaintiff, the Court assumes that [the] . . . delay[s] in treatment [allegedly] resulting in [permanent damage, visible deformity, an inability to effectively use his right hand, and permanent pain and suffering] caused Plaintiff 'extreme pain' and 'exacerbated' an injury sufficient to satisfy the objective element." *Ward v. Capra*, No. 16-CV-6533, 2019 WL 1922290, at *5 (S.D.N.Y. Apr. 30, 2019) (citations and footnote omitted) (finding that a two-week delay in the removal of surgical pins from the plaintiff's finger that allegedly caused infection, pain, "permanent deformity," and stiffness in

his finger satisfied the objective element); *see also Blanche v. Pirelli*, No. 08-CV-4751, 2009 WL 2499737, at *5 (S.D.N.Y. Aug. 7, 2009) (finding that although "courts in th[e] [Second] Circuit have held that as a matter of law, a broken finger does not meet the objective . . . test," the plaintiff's broken finger was sufficiently serious under the Eighth Amendment when "he suffered severe pain and, importantly, [wa]s left with 'protracted disfigurement of his finger'" (citations and record citations omitted)); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-CV-5440, 2005 WL 1027152, at *5 (S.D.N.Y. May 4, 2005) (finding that a pro se plaintiff adequately alleged that the injury was "sufficiently serious" when the plaintiff claimed that her finger was "damaged for the rest of her life, . . . w[ould] never be the same again, . . . and that she [wa]s still suffering" (citation, record citation, alteration, and quotation marks omitted)).[7] Thus, the Court concludes that Plaintiff has satisfied the objective prong under the Eighth Amendment.

## ii.  Subjective Prong

With respect to Dr. Ezekwe, Plaintiff again fails to sufficiently allege that this Defendant was "subjectively reckless in [his] denial of medical care." *Spavone*, 719 F.3d at 138 (citation omitted).  Plaintiff alleges that after ordering and examining x-rays of Plaintiff's hand, Dr. Ezekwe "fail[ed] to reset [P]laintiff['s] [finger] in a timely fashion" and "failed to place [P]laintiff's hand in a brace or provide any form of medical care."  (TAC ¶ 9.)  Instead, Dr. Ezekwe sent Plaintiff to Mount Vernon on the same day.  (*Id.* ¶¶ 8–9; Pl.'s Mem. 1 (clarifying that Plaintiff's injury and his examination at Mount Vernon occurred on the same day).)  As the

---

[7] Although Dr. Marcilla and State Defendants cite a number of cases in which finger injuries have been found insufficient to satisfy the objective element, (Marcilla Mem. 5–6; State Defs.' Mem. 11–13), these cases involved broken or otherwise injured fingers alone and did not involve allegations of permanent damage, deformity, long-lasting pain and suffering, and an inability to use one's hand for daily activities.

Court previously found, "[i]mmediate referral to an outside hospital for treatment . . . does not demonstrate that [Dr.] Ezekwe was deliberately indifferent to a substantial risk of harm." (2019 Op. 9 (citation omitted).) *See James v. Gage*, No. 15-CV-106, 2019 WL 1429520, at *14 (S.D.N.Y. Mar. 29, 2019) (holding that "referral to [a] [p]laintiff's medical provider is not an act of deliberate indifference"); *El-Hanafi v. United States*, No. 13-CV-2072, 2015 WL 72804, at *17 (S.D.N.Y. Jan. 6, 2015) (noting that the defendant "went a step further and ordered an x-ray," thus "respond[ing] reasonably to a known risk," even if "the harm was ultimately not avoided" (quotation marks omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 826 (1994)). Further, although Plaintiff may have preferred that Dr. Ezekwe attempt to realign his finger, "[t]he mere fact that an inmate . . . would have preferred some other form of treatment[] does not constitute deliberate indifference." *Crique v. Magill*, No. 12-CV-3345, 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) (citation omitted); *see also Chance*, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." (citation omitted)); *Ayuso v. Griffin*, No. 18-CV-3419, 2020 WL 230090, at *9 (S.D.N.Y. Jan. 14, 2020) ("[A] claim based [on] a preference of treatment, absent any other harm, is not recoverable under the Eighth Amendment." (citations omitted)); *Brown v. Montone*, No. 17-CV-4618, 2018 WL 2976023, at *6 (S.D.N.Y. June 13, 2018) (holding that the decision to treat an inmate at the internal clinic rather than refer her to an outside hospital "is not a basis for an Eighth Amendment claim," but instead reflects "mere disagreement over the proper treatment" (quotation marks omitted) (citing, inter alia, *Chance*, 143 F.3d at 703)). As before, Plaintiff does not allege that Dr. Ezekwe's failure to reset his finger immediately, rather than later that day at Mount Vernon, and failure to

provide him with a brace for his transport to Mount Vernon directly caused his injuries.  Instead, he alleges that the overall "failure to correct the injury immediately caused irreparable damages to [his] hand" and that his finger should have been aligned within two weeks.  (TAC ¶¶ 11–12.) Therefore, because Dr. Ezekwe "transferred [Plaintiff] . . . to [Mount Vernon] Hospital after h[is] initial examination[,] [s]uch a delay, if it could even be deemed a delay at all, is not grounds for a deliberate indifference claim." *Johnson v. Tucker*, No. 17-CV-2739, 2018 WL 2976022, at *5 (S.D.N.Y. June 12, 2018) (citations omitted); *see also Vallade v. Fischer*, No. 12-CV-231, 2012 WL 4103864, at *6 (W.D.N.Y. Sept. 13, 2012) (finding that when the plaintiff was, inter alia, referred to and seen by an outside specialist five weeks after his initial appointment, his allegations against the nurses who referred him "amount[ed] at most to [his] disagreement with the treatment received, or . . . the delay in referring him to an outside specialist," which, "without more," did not give rise to a claim under the Eighth Amendment).

Moreover, although Plaintiff argues that the "simple task of resetting [his finger and] providing a hand brace or splint . . . could never be considered as a disagreement in . . . medical treatment, but in fact qualifies as a complete denial of treatment," (Pl.'s Mem. 8 (citation omitted)), Dr. Ezekwe did not deny Plaintiff care but instead sent him to Mount Vernon on the same day, presumably so that Plaintiff could receive further treatment.  Finally, as previously determined, although Dr. Magill asked Plaintiff why his finger had not been realigned at Sing Sing and "informed [P]laintiff that a reset . . . should have been performed the same day when the injury occurred," (TAC ¶¶ 10–11), "disagreements among treating medical professionals do not create an inference of deliberate indifference," (2019 Op. 10 (collecting cases)).  Therefore, Plaintiff has failed to state a claim of deliberate indifference against Dr. Ezekwe.

Plaintiff has also failed to state a claim of deliberate indifference against Dr. Marcilla. Assuming for the purposes of these Motions that Dr. Marcilla is a state actor, Plaintiff alleges that upon arriving at Mount Vernon, Dr. Marcilla "examined [his] hand," determined that his injury was "not life-threatening," and informed Plaintiff that he would be scheduled to see a bone specialist.  (TAC ¶ 9-B.)[8]  Plaintiff alleges that Dr. Marcilla "did not reset [P]laintiff's hand or provide[] him with needed pain medication to relieve his extreme pain."  (*Id.*)

As with Dr. Ezekwe, Plaintiff has not established that Dr. Marcilla was "subjectively reckless in [his] denial of medical care."  *Spavone*, 719 F.3d at 138.  First, Dr. Marcilla decided to refer Plaintiff to a bone specialist for further treatment.  Although referral to a specialist does not always constitute sufficient care, cases finding that referral was inadequate involved defendants who saw or received complaints from injured plaintiffs over a period of time and failed to provide medical aid for an injury.  *See, e.g., Hemmings v. Gorczyk*, 134 F.3d 104, 109

---

[8] As with Mount Vernon, Dr. Marcilla does not address Plaintiff's allegation that Dr. Marcilla "is an employee of Mount Vernon . . . that is *contracted* to provide medical treatment to inmates within [DOCCS]."  (TAC ¶ 5 (emphasis added).)  Although the Court need not determine Dr. Marcilla's status as a state actor here, the Court does note that Dr. Marcilla has not addressed case law suggesting that private physicians who work with a hospital contracted to render services to inmates may be state actors for the purposes of § 1983.  *See Rodriguez v. Mount Vernon Hosp.*, No. 09-CV-5691, 2010 WL 3825736, at *4 (S.D.N.Y. Sept. 7, 2010) (determining that the plaintiff's proposed amended complaint would not be futile when it sought punitive damages from an "outside physician who work[ed] for an outside hospital that [DOCCS] ha[d] a contract with to render services to its inmates" because "a doctor may still be considered a state actor as long as the doctor was obligated, even if indirectly, to provide medical services to state inmates" (citations, record citation, and quotation marks omitted)), *adopted by* 2010 WL 3825715 (S.D.N.Y. Sept. 30, 2010), *aff'd*, 2010 WL 3959602 (S.D.N.Y. Oct. 5, 2010); *Garraway v. Artuz*, No. 01-CV-3126, 2002 WL 221584, at *6 (S.D.N.Y. Feb. 13, 2002) (determining that a private physician was a state actor when his employer was "a party to a contract that require[d] him to provide medical services to prisoners in the State of New York").

Further, to the extent that Mount Vernon seeks to have the Court consider Dr. Marcilla's status as a "voluntary attending physician providing service on behalf of an entity . . . which was . . . an independent contractor for [Mount Vernon]," (Mount Vernon Mem. 5), at the motion to dismiss stage, such a consideration is improper when Dr. Marcilla's specific employee status has not been raised by Plaintiff in the TAC or his papers.

(2d Cir. 1998) (finding that the plaintiff "advanced a colorable claim that the defendants willfully disregarded his condition" when he "complained . . . for almost two months *before* being referred to a specialist" (emphasis added) (footnote omitted)); *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) ("We decline to adopt a rule that in effect would exempt general practitioners from being found deliberately indifferent to a patient's serious medical needs as long as that general practitioner at some point refers the patient to a specialist, regardless of the extent of contact that general practitioner has with the patient."). Indeed, the Second Circuit has distinguished such cases from those where "a general practitioner merely referred a patient to a specialist and had limited subsequent contact with that patient." *Id.* Here, Dr. Marcilla was not Plaintiff's regular provider, saw Plaintiff only once before deciding to refer him to a bone specialist, and does not appear to have seen Plaintiff again. Based on these allegations, Plaintiff has not sufficiently stated a claim for deliberate indifference against Dr. Marcilla. *See James*, 2019 WL 1429520, at *14 (holding that "referral to [a plaintiff's] medical provider is not an act of deliberate indifference"); *Sharma v. D'Silva*, 157 F. Supp. 3d 293, 303 (S.D.N.Y. 2016) (finding that "[r]eferral for specialist care constitute[d] an appropriate treatment action," particularly when the defendants who made the referral were not the plaintiff's primary healthcare providers (citation, alterations, and quotation marks omitted)); *Santos v. Nicholls*, No. 10-CV-3159, 2013 WL 3305336, at *6 (S.D.N.Y. July 1, 2013) (noting that a plaintiff "failed to allege that any defendant acted with deliberate indifference in responding to his hearing loss" when, inter alia, one defendant referred him to an ear, nose, and throat specialist); *Harrington v. Mid-State Corr. Facility*, No. 09-CV-85, 2010 WL 3522520, at *11 (N.D.N.Y. May 21, 2010) ("[The defendant's] actions of referring [the plaintiff] to a specialist, more familiar with the intricacies of [the plaintiff's] subjective symptoms, belies any claim of deliberative indifference."), *adopted*

*by* 2010 WL 3522516 (N.D.N.Y. Sept. 2, 2010); *Vasquez v. Canfield*, 678 F. Supp. 2d 96, 99

(W.D.N.Y. 2010) (finding that the defendant doctor's "very prompt[] . . . referral" of the plaintiff

to an "orthopedic specialist . . . hardly suggest[ed] a culpable, wanton desire to inflict pain on

[the] plaintiff").

Additionally, to the extent Plaintiff alleges that a delay in his appointment with Dr.

Magill caused or exacerbated his injury, there is no indication from the TAC that Dr. Marcilla

was the cause of that delay, thus dooming this as a basis to hold Dr. Marcilla liable.  *See Stewart*

*v. City of New York*, No. 15-CV-4335, 2018 WL 1633819, at *8 (S.D.N.Y. Mar. 31, 2018)

(finding that the plaintiff did not "allege facts indicating that any . . . [d]efendant acted

intentionally to delay the provision of medical treatment in a way that subjected [the plaintiff] to

an excessive risk of harm").  For example, Plaintiff does not allege that Dr. Marcilla was

responsible for scheduling Plaintiff's appointment with Dr. Magill, or even that Dr. Marcilla was

aware that Plaintiff's appointment had been scheduled for five weeks later.  *See Singletary v.*

*Russo*, 377 F. Supp. 3d 175, 193 (E.D.N.Y. 2019) (finding that when there was no indication that

the plaintiff followed up with the defendant about whether his specialist appointment had been

scheduled or that the defendant was aware that the appointment had not been promptly

scheduled, the defendant "could not have been expected to know that a risk of substantial harm

existed"); *Ramos v. New York State*, No. 17-CV-337, 2017 WL 4326521, at *3 (N.D.N.Y. Sept.

28, 2017) (noting that the plaintiff did not allege that the defendants "orchestrated [a] delay[]" in

treatment of a broken finger of five weeks and two days "to punish him").

Further, given Dr. Marcilla's decision to refer Plaintiff to a specialist, Plaintiff's

allegations that Dr. Marcilla did not reset his finger or provide him with pain medication,

particularly when there is no allegation in the TAC that Plaintiff asked for this medication or

informed Dr. Marcilla that he was in extreme pain, are insufficient to state a deliberate indifference claim under the subjective prong.  "[T]he decision to prescribe medication, or not, is a medical determination," *Phelan v. Quinn*, No. 11-CV-314, 2012 WL 2325845, at *6 (N.D.N.Y. May 21, 2012) (citation omitted), *adopted by* 2012 WL 2326161 (N.D.N.Y. June 19, 2012), and here, when Plaintiff has not pled facts "tending to show that [Dr. Marcilla] . . . took *affirmative steps* to ensure that [the plaintiff] would not receive his medical treatment," *Myrie v. Calvo*, 615 F. Supp. 2d 246, 248 (S.D.N.Y. 2009) (emphasis added), Dr. Marcilla's "failure to prescribe such medication constitutes no more than negligence," *Phelan*, 2012 WL 2325845, at *6 (citation omitted).  *See also Whitley v. Ort*, No. 17-CV-3652, 2018 WL 4684144, at *8 (S.D.N.Y. Sept. 28, 2018) (granting a motion to dismiss when the defendant examined the plaintiff and evaluated his injuries, "no outright denial of care" had been alleged, and there were no "accompanying facts from which it [could] be inferred that [the defendant] knew of and disregarded a substantial risk of serious harm to [the] [p]laintiff"); *Bilodau v. Pillai*, No. 10-CV-1910, 2011 WL 3665428, at *4 (D. Conn. Aug. 22, 2011) ("[The plaintiff] does not allege that he complained of ankle pain during his visit with [the defendant].  Thus, the fact that [the defendant] did not order pain medication does not constitute deliberate indifference to his ankle injury."); *Harrington*, 2010 WL 3522520, at *11 (granting a motion to dismiss where, although the plaintiff alleged that the defendant had not prescribed pain medication, the defendant had referred the plaintiff to "specialist care" and later had "explain[ed] the specialist's findings[] and referr[ed] for further diagnostic follow-up" (citation omitted)); *Grant v. Burroughs*, No. 96-CV-2753, 2000 WL 1277592, at *5 (S.D.N.Y. Sept. 8, 2000) (finding that "[the] plaintiff's complaint . . . that in his judgment[,] he should have received pain medication when medical personnel did not believe his condition required pain medication" did not state a claim for

24

deliberate indifference when, "[a]lthough a prisoner is entitled to medical care, he does not have

the right to the treatment of his choice" (citation omitted)).  Indeed, "a prisoner's disagreement

with the diagnostic techniques or forms of treatment employed by medical personnel does not

itself give rise to an Eighth Amendment claim," *Troy v. Kuhlmann*, No. 96-CV-7190, 1999 WL

825622, at *6 (S.D.N.Y. Oct. 15, 1999) (citing *Estelle*, 429 U.S. at 107), and "[m]edical

malpractice does not become a constitutional violation merely because the victim is a prisoner,"

*Estelle*, 429 U.S. at 106; *see also Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) ("[M]ere

malpractice of medicine in prison . . . may cover . . . a mistaken decision not to treat based on an

erroneous view that the condition is benign or trivial or hopeless . . . ." (citation omitted)).

Plaintiff also does not allege that Dr. Marcilla "actually acknowledged any increased risk

resulting from [the failure to reset his finger or] the . . . delay" in an appointment with a bone

specialist.  (2019 Op. 13 n.3.)  For example, there is no indication in the TAC that Dr. Marcilla

informed Plaintiff that a delay in resetting his finger or seeing a bone specialist could result in

increased risk or permanent injury, and although Dr. Marcilla noted that Plaintiff's injury was

"not life-threatening," Plaintiff does not allege that Dr. Marcilla denied or delayed any treatment

to Plaintiff on that basis.  *Cf. Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 542

(S.D.N.Y. 2015) (denying motion to dismiss deliberate indifference claims where a defendant

told the plaintiff that "the [procedure] was not going to happen because [the] [p]laintiff's injuries

were not life threatening, and he would therefore have to wait to receive surgery until he was

transferred or . . . released" (record citation omitted)); *Benjamin v. Schwartz*, 299 F. Supp. 2d

196, 201 (S.D.N.Y. 2004) (denying motion to dismiss where the plaintiff alleged that the doctor

"*deliberately* failed to schedule him for [a] needed [procedure] for almost two years, well

knowing that excessive delay could mean permanent disability" (emphasis added)), *aff'd sub*

*nom. Benjamin v. Koeningsmann*, 204 F. Appx. 979 (2d Cir. 2006); *see also Dotson v. Fischer*, 613 F. App'x 35, 38–39 (2d Cir. 2015) (denying motion to dismiss where the defendants "reviewed [a doctor's] evaluation and recommendation that [the plaintiff's] condition demanded 'urgent' care and rejected it, apparently without causing him to be examined again in person or taking any further step," which resulted in a year-long delay in the plaintiff's needed medical procedure). And, as with Dr. Ezekwe, the fact that Dr. Magill asked Plaintiff why his finger had not been realigned earlier and "informed [him] that a reset . . . should have been performed the same day when the injury occurred," (TAC ¶¶ 10–11), is not dispositive, as "disagreements among treating medical professionals do not create an inference of deliberate indifference," (2019 Op. 10 (collecting cases)). *Cf. Hemmings*, 134 F.3d at 106–07 (denying motion to dismiss when the plaintiff alleged that the defendants refused the plaintiff's "repeated requests" to see a specialist or for other treatment over the course of three months, one of the defendants allegedly maliciously took away his crutch, and a specialist eventually called the plaintiff's injuries "classic" and "expressed shock at the prison's failure to diagnose and treat [the plaintiff]" (quotation marks omitted)). Relatedly, although Plaintiff states that Dr. Magill informed him that the failure to reset his finger "caused irreparable damages to [P]laintiff's hand," it is unclear whether Plaintiff alleges that the deformity, pain, and inability to use his hand was caused by Dr. Marcilla's failure to reset his finger, or by the "long delay" in surgery and removal of the surgical pins by Dr. Magill. (*See* TAC ¶ 13 ("[S]uch a long delay in surgery would make a successful[] repair of [P]laintiff's finger and the chance of normal use of [P]laintiff's hand unlikely."), 16 ("As a result [of the delayed pin removal], [P]laintiff's finger is deformed[,] and [he] has [limited] use of his right hand.").) As such, Plaintiff has not satisfied the subjective

26

prong of the Eighth Amendment with respect to Dr. Marcilla, and his claims against this

Defendant are dismissed.[9]

With respect to Dr. Magill, Plaintiff alleges that at his appointment on February 27, 2016,

Dr. Magill informed Plaintiff that he needed surgery, which he then scheduled for October 2016.

(TAC ¶¶ 10, 12–13.)  According to Plaintiff, Dr. Magill "was aware that such a long delay . . .

would make a successful[] repair of [P]laintiff's finger and the chance of normal use of

[P]laintiff's hand unlikely," (*id.* ¶ 13), and Dr. Magill scheduled the surgery for October

"knowing" of this risk, (Pl.'s Mem. 2).  Plaintiff appears to allege that this delay caused at least

some of the permanent damage to his hand.  (TAC ¶ 13.)[10]  Drawing all reasonable inferences in

Plaintiff's favor, the Court cannot dismiss the TAC as it pertains to Dr. Magill at this early stage,

where Plaintiff has alleged that despite knowing of a "[]likely" risk that Plaintiff would suffer

permanent damage if his surgery was delayed, Dr. Magill actively scheduled that surgery for

eight months later.  (*Id.*)  *See Lloyd v. Lee*, 570 F. Supp. 2d 556, 569 (S.D.N.Y. 2008) (denying

motion to dismiss where doctors "knew that [the plaintiff] was experiencing extreme pain and

loss of mobility," but "[n]ine months went by after [an] MRI was first requested before the MRI

was actually taken"); *Benjamin*, 299 F. Supp. 2d at 200–01 (finding that the plaintiff "state[d] a

potentially viable claim for deliberate indifference" when a surgeon "definitively . . . stated that

---

[9] As with Mount Vernon, given that this is the first adjudication on the merits of Plaintiff's claims against Dr. Marcilla, this dismissal is without prejudice.

[10] State Defendants seek to have the Court consider Plaintiff's previous assertion in his SAC that "the surgery was scheduled with time to determine whether Plaintiff was fit enough to undergo a surgery."  (State Defs.' Mem. 17.)  However, this allegation is omitted from the TAC, and "once an amended pleading is filed, a court may not import information that was contained in the prior pleading but omitted from the amended pleading."  *Russell v. Westchester Cmty. Coll.*, No. 16-CV-1712, 2017 WL 4326545, at *8 n.7 (S.D.N.Y. Sept. 27, 2017) (citing *Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 32 (2d Cir. 2002)).

surgery was needed" but did not perform that surgery for approximately a year, leaving the

plaintiff with permanent pain and an inability to lift his right arm); *cf. Bennett v. Care Corr.*

*Solution Med. Contractor*, No. 15-CV-3746, 2017 WL 1167325, at *8 (S.D.N.Y. Mar. 24, 2017)

(dismissing a deliberate indifference claim based on a three-month delay in surgery where the

plaintiff had not "alleged any conduct or behavior that would suggest the delay was caused by

[the defendants'] deliberate indifference" (citation omitted)), *appeal dismissed sub nom. Bennett*

*v. Correct Care Solutions*, *LLC*, No. 17-1011, 2018 WL 1756123 (2d Cir. Jan. 9, 2018).  As

such, the Court does not dismiss this aspect of Plaintiff's claim against Dr. Magill.[11]

### b.  Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (citation and quotation marks omitted).  "[Qualified] immunity protect[s]

government's ability to perform its traditional functions . . . by helping to avoid unwarranted

timidity in performance of public duties, ensuring that talented candidates are not deterred from

---

[11] Plaintiff also alleges that Dr. Magill did not remove Plaintiff's surgical pins within the required eight-week time frame and that he "allowed four months to pas[s] without removing the pins."  (TAC ¶ 16; Pl.'s Mem. 8.)  However, as with Plaintiff's SAC, Plaintiff does not allege any facts suggesting that the delay was due to an affirmative decision by Dr. Magill.  Instead, Plaintiff claims that "[t]he eight-week period elapsed without [Dr.] Magill removing the 'pins' from [P]laintiff's finger," despite Plaintiff's complaints to Sing Sing medical staff and the Inmate Grievance Resolution Committee "regarding his urgent need to have the pins removed . . . and that he was in extreme pain."  (TAC ¶ 16.)  Thus, Plaintiff appears to attribute the delay to individuals who are not named as Defendants in this case, seriously undercutting any responsibility Dr. Magill had for the delay.  *See Oliver v. Haddock*, No. 08-CV-4608, 2009 WL 4281446, at *6 (S.D.N.Y. Dec. 1, 2009) (recommending dismissal of complaint where the plaintiff failed to demonstrate that the doctor, as opposed to another individual, selected the date for a medical procedure, and did so "with deliberate indifference to [the plaintiff's] medical needs"), *adopted by* 2010 WL 305282 (S.D.N.Y Jan. 22, 2010).  Accordingly, the Court dismisses any claims against Dr. Magill as it relates to the removal of the surgical pins.

public service, and preventing the harmful distractions from carrying out the work of government that can often accompany damages suits." *Filarsky v. Delia*, 566 U.S. 377, 389–90 (2012) (second alteration in original) (citations and quotation marks omitted).  Qualified immunity shields a defendant from standing trial or facing other burdens of litigation "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (citations and quotation marks omitted). State Defendants argue that Dr. Magill is entitled to qualified immunity because "reasonable officials in . . . Dr. Magill's position[] could have believed that . . . any delay in treatment of Plaintiff's dislocated finger would not violate the Constitution," and that the Supreme Court and the Second Circuit have not "established that setting a corrective surgery to repair a minor finger injury for eight months later is unconstitutional."  (State Defs.' Mem. 19–20.)  However, Plaintiff has alleged that Dr. Magill did, in fact, know that delaying the surgery until October decreased the chances of Plaintiff's full recovery and risked permanent damage to Plaintiff's hand.  (TAC ¶ 13; Pl.'s Mem. 2.)  Moreover, "[a] prisoner's Eighth Amendment right to be free from deliberate indifference to his serious medical needs is quite clearly established and has been for some time," and "[n]o doctor could possibly believe that deliberate indifference to a patient's serious medical problem did not violate the Eighth Amendment." *Benjamin*, 299 F. Supp. 2d at 201 (finding that qualified immunity was not available as a matter of law when the doctor "deliberately failed" to schedule a plaintiff for needed surgery, "knowing that excessive delay could mean permanent disability").  Thus, the Court will not dismiss Plaintiff's claim against Dr. Magill based on qualified immunity at this early stage, without the benefit of discovery. *Cf. Watts v. U.S. Fed. Bureau of Prisons*, No. 07-CV-773, 2009 WL 81285, at *16 (N.D.N.Y. Jan. 9,

2009) (determining, on summary judgment and after discovery, that the defendants were entitled to qualified immunity because "[t]he record firmly establish[ed] that the delay in arrangement for . . . surgery[] of [the] plaintiff's little finger condition was based upon logistical constraints").[12]

### c.  State Law Claims

To the extent Plaintiff alleges state law claims of negligence and medical malpractice against Dr. Magill, these claims are barred by New York Correction Law § 24, which provides that "[n]o civil action shall be brought in any court of the state . . . against any officer or employee of [DOCCS] . . . in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of employment and in the discharge of duties by such officer or employee."  N.Y. Correct. Law § 24; *see also Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996) (holding that § 24 applies to claims in federal court).  Therefore, "[c]ourts in the Second Circuit have long held that [§] 24 precludes a plaintiff from raising state law claims in federal court against state employees in their personal capacities for actions arising within the scope of their employment."  *Davis v. McCready*, 283 F. Supp. 3d 108, 123 (S.D.N.Y.

---

[12] However, State Defendants do correctly point out that the Eleventh Amendment bars all claims for damages against State Defendants in their official capacities.  (State Defs.' Mem. 20–21; *see* TAC ¶¶ 8, 22 (indicating that State Defendants are sued in their individual and official capacities).)  The Second Circuit has held that "[t]o the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."  *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) (citations omitted).  Accordingly, suits against state officials in their official capacity seeking damages are routinely dismissed on immunity grounds.  *See, e.g.*, *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (holding that the Eleventh Amendment barred claims against a prison superintendent in his official capacity); *Jackson v. Bederman*, No. 12-CV-1338, 2014 WL 2805242, at *13 (S.D.N.Y. June 20, 2014) (holding that the Eleventh Amendment barred claims against DOCCS officials in their official capacities).  Therefore, to the extent Plaintiff sues Dr. Magill in his official capacity, his claim fails.

2017) (collecting cases).  Here, Dr. Magill was clearly a DOCCS employee performing his duties

at Fishkill when the alleged constitutional violations occurred.  (TAC ¶ 7 ("Dr. Magill . . . is at

all times relevant to this Complaint . . . an employee of [DOCCS].  He is the medical

[d]octor[] . . . assigned to provide medical service to [P]laintiff while housed in Fishkill . . . .").)

Any state law claims against Dr. Magill must therefore be dismissed.

### III.  Conclusion

For the foregoing reasons, Mount Vernon's Motion To Dismiss is granted, Dr. Marcilla's

Motion To Dismiss is granted, and State Defendants' Motion To Dismiss is granted in part and

denied in part.  Plaintiff's claims against Mount Vernon and Dr. Marcilla are dismissed without

prejudice.  Plaintiff's claims against Dr. Ezekwe and claims against Dr. Magill related to the

removal of his surgical pins are dismissed with prejudice.[13]  Any claims against Dr. Magill in his

official capacity or under state law are also dismissed.  However, Plaintiff's claims against Dr.

Magill related to the delay in surgery survive the instant Motions.  If Plaintiff wishes to file a

fourth amended complaint as to Defendants Mount Vernon, Dr. Marcilla, and Dr. Magill *only*,

Plaintiff must do so within 30 days of the date of this Opinion.  Plaintiff should include within

that fourth amended complaint all changes to correct the deficiencies identified in this Opinion

that Plaintiff wishes the Court to consider.  Plaintiff is advised that the fourth amended complaint

---

[13] The Court dismisses these claims with prejudice, as Plaintiff already had a second bite at the apple with his TAC.  *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (citation, alterations, and quotation marks omitted)); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at *3 (N.D.N.Y. Sept. 30, 2015) (dismissing amended complaint with prejudice where the "[p]laintiff has already been given one opportunity to amend his complaint . . ., and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity").

will replace, not supplement, all prior complaints and filings.  The fourth amended complaint must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider.  If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 79, 85, 90), and to mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

DATED:      July 31, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE